## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                        )
**ROBERT REISER & COMPANY,**            )
                                        )
   **Plaintiff/Counterclaim-Defendant,**  )
                                        )     **Civil Action No.**
   **v.**                               )     **15-11746-FDS**
                                        )
**SCOTT SCRIVEN,**                      )
                                        )
   **Defendant/Counterclaim-Plaintiff.** )
_____)

### MEMORANDUM AND ORDER ON
### <u>ROBERT REISER & COMPANY'S MOTION FOR SUMMARY JUDGMENT</u>

**SAYLOR, J.**

This is a contract dispute arising out of an employment termination. Jurisdiction is based on diversity of citizenship. Plaintiff Robert Reiser & Company has brought suit against defendant Scott Scriven, a former employee, alleging claims for breach of contract, conversion, and breach of the implied covenant of good faith and fair dealing. Scriven has brought counterclaims against the company alleging claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and retaliation.

Reiser has moved for summary judgment on its breach of contract and conversion claims and all of Scriven's remaining counterclaims. Reiser has also moved to strike certain portions of an affidavit filed by Scriven under the "sham affidavit" rule. For the following reasons, both the motion to strike and the motion for summary judgment will be granted in part and denied in part.

# I.      Background

## A.      Factual Background

The following facts are either undisputed or taken in the light most favorable to Scriven as the non-moving party.

Plaintiff Robert Reiser & Company ("Reiser") is a supplier of food processing and packaging equipment located in Canton, Massachusetts.  (Dkt. 80, Def. Resp. to Pl. SMF ¶¶ 1-2). Roger Reiser is the President and Chief Executive Officer of the company.  (*Id.* ¶ 2).  George Reiser is a Vice President.  (*Id.*).[1]

At the beginning of 2013, defendant Scott Scriven was President and Chief Executive Officer at Weber, Inc., in Kansas City, Missouri.  (*Id.* ¶ 3).  In February 2013, Reiser company executives, including Roger and George, contacted Scriven to gauge his interest in working for the company.  (*Id.* ¶ 4).  Over the next few months, Scriven was contacted by Roger, George, and Jack Derby, the Chairman of the Board at Reiser, for the purpose of recruiting him to join the company.  (*See id.*).

On July 12, 2013, Reiser offered Scriven the position of Senior Vice President of Sales and Marketing, "reporting directly to Roger as CEO and President."  (Anderson Decl. Ex. 4, "Offer Letter").  The offer letter stated that should Scriven accept the position, his employment would be "at will," and the company could terminate his employment "at any time, for any reason, with or without notice."  (*Id.* at 4).

The offer letter also included a relocation package.  As part of that package, the company offered to give Scriven a "$300,000 interest-free loan for the purchase of a new house."  (*Id.* at 3). The terms stated that the loan "would be a note to Reiser secured by the property"; "[i]t would be

---

[1] To avoid confusion, the Court will refer to the plaintiff, the entity Robert Reiser & Company, as "Reiser," and to the individuals Robert and George Reiser by their first names.

a 20 year note"; "[p]ayments would begin in [y]ear 6"; and "[i]f [Scriven] were to leave Reiser, this note would be due." (*Id.*). Finally, the offer letter provided that upon termination, Scriven was entitled to six months of severance pay if the company were to recommend a separation without cause. (*Id.*).

Scriven accepted the offer from the company and submitted his resignation to his former employer on July 15, 2013. (Def. Resp. to Pl. SMF ¶ 7).

In late 2013, Scriven accepted a $400,000 loan from Reiser, which he used toward purchasing a home in Massachusetts for $405,000. (*Id.* ¶ 12). Of that amount, $300,000 was in accordance with Scriven's relocation package as outlined in the offer letter. The terms of the additional $100,000 loan were set forth in e-mail correspondence between Scriven and Eric Olson, Reiser's Chief Financial Officer. (*Id.* ¶ 11). The $100,000 was also interest-free, and it was to be paid back with the proceeds from the sale of Scriven's home in Kansas City. (*Id.* ¶¶ 11-12).

In August 2013, shortly after beginning at Reiser, Scriven learned that the company did not pay overtime to non-exempt hourly employees, including service technicians. (Scriven Dep. 70-71). The issue was first raised at a strategy meeting among senior managers by Bob Fleck, a manager in Reiser's service division. (*Id.*). A "brief debate" was held on whether the company should, in fact, pay overtime to non-exempt employees, with Scriven advocating on the side of the employees. (*Id.* at 72). The discussion was ended abruptly by George, who asked whether those in favor of paying overtime were "labor lawyers." (*Id.* at 73).

In January 2014, Scriven allegedly learned that the company "routinely over-invoiced customers" on machine purchases. (*Id.* at 78-79). Scriven raised concerns with CFO Olson, who allegedly acknowledged the over-invoicing. (*Id.* at 80). According to Scriven, Olson told him

that he had previously broached the subject with George, who instructed him to "mind his own business." (*Id.*).

Reiser contends that Scriven's performance fell short of the company's expectations, and that, in substance, Scriven was in over his head and unable to deliver on certain critical functions. Scriven, of course, disputes that characterization of his work.  It is undisputed, however, that Chairman Derby and others met with Scriven on more than one occasion to discuss concerns over certain issues falling within Scriven's responsibilities.  Derby met with Scriven in April and May 2014 to discuss the fact that hiring in sales and marketing positions was behind schedule.  (Def. Resp. to Pl. SMF ¶ 14).[2]  Reiser contends that Scriven met again with Derby, Roger, and George in September 2014 to discuss his performance, and that the three expressed dissatisfaction with Scriven's sales plan and requested that he provide a new, more detailed plan.  (*Id.* ¶ 18).[3]  Reiser also contends that the three men were unhappy with Scriven's "lack of depth in understanding the Reiser business."  (Anderson Decl. Ex. 7, at 2).

Derby and Scriven met again following the company's October 2014 board meeting. (Scriven Dep. 102-03).  Reiser contends that Derby identified several areas of concern with Scriven's performance, including the fact that several critical positions remained unfilled and that Scriven's discussion of the second-quarter sales plan at the board meeting had been poor.  (Def. Resp. to Pl. SMF ¶ 19).  For his part, Scriven testified that he remembered the meeting "revolving more around the frustration that [he] and the sales managers had with trying to meet budget numbers that nobody believed to be realistic."  (Scriven Dep. 103).  A follow-up meeting was held on October 22, 2014, with Roger and George also in attendance.  (*Id.* at 122).  On October

---

[2] Scriven appears to agree that hiring was behind schedule, but disputes that he was to blame.  (Def. Resp. to Pl. SMF ¶ 14).

[3] At his deposition, Scriven was unable to recall a meeting in September.  (Scriven Dep. 116).

29, 2014, Derby e-mailed Scriven, requesting that he prepare a "short term recovery plan" for

sales; when Scriven asked Roger what he was looking for in the plan, Roger allegedly responded,

"That's what we f-ing hired you for," and refused to provide Scriven with any further guidance.

(Scriven Dep. Ex. 13; Scriven Dep. 143-45).

On February 2, 2015, George and Roger terminated Scriven's employment.  (Def. Resp. to

Pl. SMF ¶ 24).  During the meeting, Roger and George told Scriven they would pay his severance,

but did not discuss whether he was being fired for cause.  (*Id.* ¶ 26).  Scriven received a $100,000

bonus for 2014, and a partial severance payment.  (*Id.* ¶ 30).  Scriven returned to his home in

Kansas City, which had not been sold; eventually, he sold his Massachusetts home for $455,000,

of which $400,000 is being held in escrow.  (*Id.* ¶¶ 27, 33).

During his employment, Reiser provided Scriven with a company-owned laptop computer;

after his termination, Reiser allowed him to take the laptop home in order to remove any personal

information contained in it.  (*Id.* ¶ 26).  Scriven is still in possession of the laptop.  (*Id.* ¶ 27).

### B.  <u>Procedural Background</u>

On April 29, 2015, Reiser filed the complaint in this action.  It alleges claims for

(1) breach of contract, (2) conversion, and (3) breach of the implied covenant of good faith and

fair dealing.  On June 23, 2015, Scriven answered and brought eight counterclaims.  Of those

counterclaims, only Scriven's claims for breach of contract, breach of the implied covenant of

good faith and fair dealing, and retaliation remain.[4]

Reiser has now moved for summary judgment on all claims and counterclaims.  Reiser has

also moved to strike certain portions of an affidavit filed by Scriven under the "sham affidavit"

---

[4] The Court previously dismissed Scriven's counterclaims for intentional misrepresentation, usury, undue influence, unconscionability, and breach of fiduciary duty.  *See* Dkt. 41.

rule.  For the following reasons, the motion to strike and the motion for summary judgment will be granted in part and denied in part.

## II.    Reiser's Motion to Strike

As an initial matter, Reiser has moved to strike from the record an affidavit submitted by Scriven and a "reference check sheet" that Scriven contends contains favorable statements made by Jack Derby concerning Scriven's performance at Reiser.  For the following reasons, the motion will be granted in part as to the affidavit, and denied as to the reference check sheet.

### A.    Motion to Strike Portions of Scriven's Affidavit

Reiser has moved to strike three paragraphs of Scriven's affidavit under the "sham affidavit" rule.  "When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994); *see also Torres v. E.I. Dupont De Nemours & Co.*, 219 F.3d 13, 20 (1st Cir. 2000); 10A Charles Alan Wright, Arthur R. Miller, & Mary Kay Allen, Federal Practice & Procedure § 2726 (3d ed. 1998).  The "sham affidavit" rule safeguards the integrity of summary judgment proceedings by preventing a party from "manufactur[ing] a dispute of fact by contradicting his earlier sworn testimony without a satisfactory explanation of why the testimony is changed."  *Abreu-Guzman v. Ford*, 241 F.3d 69, 74 (1st Cir. 2001).

Reiser identifies three paragraphs in Scriven's affidavit that it contends are contradictory to his deposition testimony.  The first is Scriven's statement that at a strategy meeting in August 2013, George Reiser asked whether he and Eric Olson were "labor attorneys."  (Scriven Aff. ¶ 13).  That statement is not clearly contradictory to Scriven's testimony that he viewed George's

statement as directed at him, Olson, and Bob Fleck, who had raised the issue at the meeting.

The second statement is Scriven's assertion in his affidavit that he "attempted to address the overtime issue without success, which compromised my status with R. Reiser and G. Reiser." (Scriven Aff. ¶ 14).  That statement does appear to contradict his deposition testimony:

> Q:  Did you ever speak to anybody else [other than Gretchen O'Brien] about [the overtime issue]?
>
> A:  No.

(Scriven Dep. 76).  He also further testified that neither Roger nor George ever "said anything" to him about the issue.  (*Id.*).  Scriven does not offer any explanation for the discrepancy between his affidavit and his deposition answers; accordingly, paragraph 14 of the affidavit will be struck.

The third statement is Scriven's assertion that he raised his concerns about over-invoicing directly with Roger Reiser after first discussing the issue with Olson.  (Scriven Aff. ¶ 17).[5]  At his deposition, however, Scriven testified as follows:

> Q:  [A]fter you spoke to [Olson], did you talk to anybody else about it?
>
> A:  I don't believe so.
>
> Q:  Did Roger or George come and talk to you about it?
>
> A:  No.
>
> . . .
>
> Q:  After you had that meeting with [Olson], what did you do, if anything, regarding this overbilling issue . . . ?
>
> A:  Nothing.

(Scriven Dep. 81-82).  Again, Scriven offers no explanation for the discrepancy.  Accordingly, paragraph 17 of the affidavit will also be struck.

---

[5] The affidavit states only that Scriven "addressed [the] issue with R. Reiser, which compromised [Scriven's] status with R. Reiser and G. Reiser."  (Scriven Aff. ¶ 17).

B.      **Motion to Strike the "Reference Check Sheet"**

Reiser has also moved to strike a "Reference Check Sheet" submitted by Scriven in

support of his opposition to summary judgment on the grounds that it (1) has not been properly

authenticated and (2) contains inadmissible hearsay.   "To satisfy the requirement of authenticating

or identifying an item of evidence, the proponent must produce evidence sufficient to support a

finding that the item is what the proponent claims it is."  Fed. R. Evid. 901.  At the hearing on this

motion, the Court granted Scriven's motion to file (late) an affidavit from Jeff Valentine, a

recruiter, who asserted that he created the document and that the contested portions of the

document are quotes of statements made to him by Jack Derby, Reiser's Chairman of the Board.

The Court finds that the Valentine affidavit suffices to authenticate the Reference Check Sheet.

To the extent that the check sheet contains statements purportedly made by Derby, they

fall outside of the definition of hearsay.  Derby, who is the Chairman of the Board at Reiser and

appears to have played a significant role in supervising Scriven, is an agent of Reiser, and his

statements therefore are statements of a party-opponent and excluded from the definition of

hearsay.  *See* Fed. R. Evid. 801(d)(2)(D).  Accordingly, the motion to strike the Reference Check

Sheet will be denied.

III.    **Reiser's Motion for Summary Judgment**

A.      **Legal Standard**

The role of summary judgment is to "pierce the pleadings and to assess the proof in order

to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822

(1st Cir. 1991) (internal quotation marks omitted).  Summary judgment is appropriate when the

moving party shows that "there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Essentially, Rule 56[] mandates

the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In making that determination, the court must view "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).  When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotations omitted).  The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

### B.   Reiser's Claims

#### 1.   Breach of Contract and Breach of Implied Covenant of Good Faith and Fair Dealing (Counts One and Three)

Count One alleges a claim for breach of contract arising out of Scriven's failure to repay the $400,000 loaned to him by Reiser for the purchase of his residence in Massachusetts.  To prove a breach of contract under Massachusetts law, a plaintiff must show "that there was a valid contract, that the defendant breached [his] duties under the contractual agreement, and that the breach caused the plaintiff damage." *Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 316 (D. Mass. 1997); *accord Michelson v. Digital Fin. Servs.*, 167 F.3d 715, 720 (1st Cir. 1999).

Scriven does not dispute that his acceptance of the July 12, 2003 offer letter formed a valid employment contract.  As noted, the company offered Scriven a relocation package that included a "$300,000 interest-free loan for the purchase of a new house." (Offer Letter at 4).  The terms stated that the loan "would be a note to Reiser secured by the property"; "[i]t would be a 20

year note"; "[p]ayments would begin in [y]ear 6"; and "[i]f [Scriven] were to leave Reiser, this note would be due." (*Id.*).

In December 2013, the company and Scriven agreed to increase the amount of the loan by $100,000. (Def. Resp. to Pl. SMF ¶¶ 10-12). The parties agreed that the original $300,000 would remain subject to the terms specified in the offer letter, and that the additional $100,000 "must be paid back with the proceeds from the sale of [Scriven's] home in Kansas City." (*Id.*).

Scriven does not deny that he has not repaid the loans or that he owes the $400,000 to Reiser. In his opposition, however, Scriven appears to contend that he has not breached the contract because either (1) he may be entitled to an offset based on his counterclaim for severance pay or (2) he offered to allow Reiser to hold the money in escrow pending the result of this litigation. Neither issue, however, speaks to Scriven's liability for breach of the express terms of the agreement. The evidence is clear that under the terms of the offer letter, the $300,000 loan became due when Scriven's employment with Reiser ended.[6] That amount remains unpaid. Accordingly, Reiser is entitled to summary judgment on Count One with respect to the $300,000 loan.

The additional $100,000 stands on a slightly different footing. Under the parties' agreement, that amount was to be repaid with the proceeds of the sale of Scriven's home in Kansas City. Because Scriven has not sold that home, it is difficult to conclude that he has breached the express terms of the agreement. Count Three, however, alleges that Scriven's failure to repay the $100,000 amounts to a breach of the implied covenant of good faith and fair dealing.

---

[6] Scriven also refers vaguely to "factual disputes" as to the terms of the loan, including the "repayment terms." (Def. Opp. Mem. 7). However, he does not specifically identify the terms that are purportedly in dispute, and has failed to point to any evidence in the record supporting that assertion.

Under Massachusetts law, a covenant of good faith and fair dealing is implied in every contract. *UNO Rests., Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004). The covenant provides that "neither party shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract." *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 471 (1991) (internal quotation marks omitted).

The implied covenant may not be invoked to create rights and duties not contemplated by the provisions of the contract or the contractual relationship. *UNO Rests.*, 441 Mass. at 385; *AccuSoft Corp. v. Palo*, 237 F.3d 31, 45 (1st Cir. 2001). However, a party may breach the covenant of good faith and fair dealing without breaching any express term of that contract. *See Fortune v. National Cash Register Co.*, 373 Mass. 96, 101 (1977). Otherwise, the implied covenant would be a mere redundancy. The essential inquiry is whether the challenged conduct conformed to the parties' reasonable understanding of performance obligations, as reflected in the overall spirit of the bargain, not whether the defendant abided by the letter of the contract in the course of performance.

Here, the express terms of the contract required that Scriven repay the $100,000 from the proceeds of the sale of his Kansas City home; implicit in that agreement, among other things, was a reasonable understanding that Scriven would make a good faith effort to sell the home.[7] In his deposition, Scriven testified that he never even listed the home for sale, and that he has no present intention of doing so now. (Scriven Dep. 57, 60). The parties' reasonable understanding of their obligations certainly did not include the possibility that Scriven could decide not to sell the home and continue to keep the money indefinitely. His failure to sell the home, coupled with his failure

---

[7] Scriven testified that his plan was to make certain renovations to the house and then either sell it in the fall of 2015 or, if the house did not sell, to rent it out. (Scriven Dep. 92-93).

to return the money, breached the implied covenant of good faith and fair dealing.[8]  Accordingly,

Reiser is entitled to summary judgment on Count Three with respect to the additional $100,000

loan.

### 2.      Conversion (Count Two)

Count Two asserts a claim for conversion under Massachusetts law based on Scriven's

failure to return the laptop computer issued to him by Reiser.[9]  The parties agree that the company

allowed Scriven to take the laptop with him after his termination in order to remove personal

information.  (Def. Resp. to Pl. SMF ¶ 26).

Scriven does not dispute that he has possession of the laptop or that it belongs to Reiser.

Instead, he contends that there is a dispute issue of material fact concerning his intent, because he

was advised by his attorneys not to return the laptop so that it could be examined by a computer

expert.  The undisputed facts, however, establish that Reiser's permission for Scriven to possess

the laptop extended solely for a reasonable amount of time necessary for him to remove his own

personal information from the device.  That period has expired, and Scriven has continued to

intentionally exercise control over the laptop.  Accordingly, Reiser is entitled to summary

judgment as to Count Two.

---

[8] Alternatively, and at a minimum, Scriven would be unjustly enriched by keeping both the $100,000 and the Kansas City home.

[9] The First Circuit has articulated the elements of the tort of conversion as follows:

> (1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused.

*Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 95 (1st Cir. 1993).

C.     **Scriven's Counterclaims**

1.      **Retaliation (Count Eight)**

Counterclaim Count Eight alleges separate claims for retaliation under Mass. Gen. Laws ch. 149, § 148A and under common law.  Scriven's statutory claim for retaliation is based on his contention that he was fired for informing George Reiser of his concerns that the company was not paying overtime to non-exempt hourly employees.  Scriven's common-law retaliation claim is based on his contention that he was terminated for confronting George Reiser over the company's practice of over-invoicing customers.

a.      **Statutory Retaliation Claim**

In Massachusetts, "the general rule [is] that '[e]mployment at will is terminable by either the employee or the employer without notice, for almost any reason or no reason at all.'"  *Wright v. Shriners Hosp. for Crippled Children*, 412 Mass. 469, 472 (1992) (quoting *Jackson v. Action for Bos. Cmty. Dev., Inc.*, 403 Mass. 8, 9 (1988)).  However, under Mass. Gen. Laws ch. 149, § 148A, "[n]o employee shall be penalized by an employer in any way as a result of any action on the part of an employee to seek his or her rights under the wages and hours provisions of this chapter."

"The plain language of the first paragraph [of § 148A] protects only actions taken by an employee 'to seek his or her rights' and does not provide similar protection for actions undertaken by a third party on behalf of another employee."  *Smith v. Winter Place LLC*, 447 Mass. 363, 368-69 (2006).  Because Scriven himself was not entitled to overtime pay, the first paragraph of the statute does not provide him with protection from termination.

The second paragraph of Mass. Gen. Laws ch. 149, § 148A states that

[a]ny employer who discharges or in any other manner discriminates against any employee because such employee has made a complaint to the attorney general or

13

> any other person, or assists the attorney general in any investigation under this
> chapter, or has instituted, or caused to be instituted any proceeding under or related
> to this chapter, or has testified or is about to testify in any such proceedings, shall
> have violated this section . . . .

"[T]he language of the second paragraph expands the range of persons and conduct protected by the statute, and likely would protect an employee (or manager) from being punished for asserting the right of another employee or complaining to management on that employee's behalf . . . ." *Smith*, 447 Mass. at 369.

The first issue, then, is whether a reasonable jury could conclude that Scriven was asserting the rights of non-exempt hourly employees to receive payment for overtime.[10]  The parties agree that he first expressed concerns about the nonpayment of overtime to non-exempt hourly employees during a strategy meeting in August 2013 after the issue was raised by Bob Fleck, the manager of Reiser's service division.  (Scriven Dep. 69-71).  At the meeting, Scriven, Fleck, and Olson advocated for paying the non-exempt employees overtime; after a "brief debate" among the group, George Reiser allegedly ended the discussion by asking the three men "if [they] were labor attorneys."  (*Id.* at 73; Scriven Aff. ¶ 13).

After the meeting, Scriven further discussed the issue with Gretchen O'Brien, Reiser's "inside recruiter," who had commented on the difficulty in discussing the non-payment of overtime with potential service technician hires.  (Scriven Dep. 45, 76).  He did not speak with anyone else at the company, and neither George nor Robert Reiser ever said anything to Scriven about the issue.  (*Id.* at 75-77).

The SJC did not elaborate in *Smith* as to what qualifies as "asserting" the rights of eligible employees.  However, the court ultimately found that a restaurant maître d' and manager who

---

[10] With some exceptions, Mass. Gen. Laws ch. 150, § 1A requires the payment of overtime to employees who exceed more than 40 hours worked in a week.

conveyed to upper management the complaints of servers about a tip-pooling scheme had not been engaged in asserting the rights of the servers.  *Smith*, 447 Mass. at 369.  Here, there is some doubt as to whether advocating for paying non-exempt employees overtime and engaging in a "brief debate" about the matter during a strategy meeting constitutes "asserting" the rights of other employees.  There is no evidence that Scriven raised the issue again with either George or Robert Reiser, Derby, or any other executive at or above his own pay grade.

In any event, even if Scriven's actions amount to protected activity, there is no evidence that his termination was the result of his support for paying overtime.  In order to succeed on a retaliation claim, a plaintiff must show that "a causal connection existed between the protected conduct and the adverse action."  *Mole v. University of Mass.*, 442 Mass. 582, 591-92 (2004) (quoting *Mesnick v. General Elec. Co.*, 950 F.2d 816, 827 (1st Cir. 1991)).  "Where adverse employment actions follow close on the heels of protected activity, a causal relationship may be inferred."  *Mole*, 442 Mass. at 595.  Almost 18 months passed between the August 2013 strategy meeting and Scriven's termination in February 2015.  Although it is true that "where there is a lack of temporal proximity, circumstantial evidence of a pattern of antagonism following the protected conduct can also give rise to the inference" that a causal connection exists, the record contains no such evidence here.  *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997) (internal quotation marks omitted); *see also Che v. Massachusetts Bay Transp. Auth.*, 342 F.3d 31, 38 (1st Cir. 2003) ("Temporal proximity is but one method of proving retaliation."). Furthermore, the fact that neither Fleck nor Olson were terminated or disciplined also weighs against a finding that Scriven was fired for his behavior in the meeting.  Simply put, there is no evidence in the record from which a reasonable jury could conclude that Scriven's termination was connected to his conduct at the August 2013 strategy meeting.

### b.     Common-Law Retaliation Claim

Massachusetts courts have also recognized an exception to the general rule allowing termination of an at-will employee when the "employment is terminated contrary to a well-defined public policy." *Wright*, 412 Mass. at 472.  As a result, "'[r]edress is available for employees who are terminated for asserting a legally guaranteed right (e.g., filing workers' compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to do that which the law forbids (e.g., committing perjury).'" *GTE Prods. Corp. v. Stewart*, 421 Mass. 22, 26 (1995) (quoting *Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch.*, 404 Mass. 145, 149-50 (1989)).

Scriven contends that his termination was in violation of Massachusetts public policy. That claim appears to be based on his contention that he was fired in retaliation for approaching George Reiser regarding alleged over-invoicing of Reiser's customers.  Obviously, overbilling may be a form of fraud, or perhaps theft; it is nonetheless unclear on this record whether the overbilling in question rises to that level.  Thus, even assuming that the prohibitions against fraud and theft constitute a "well-defined public policy," it is unclear whether the company actually engaged in that kind of behavior, as opposed to (for example) breaching one or more contractual obligations.  *Cf. Mercado v. Manny's T.V. & Appliance, Inc.*, 77 Mass. App. Ct. 135, 139 (2010) ("It is well established that Massachusetts law does not protect at-will employees who claim to be fired for their complaints about internal company policies or the violation of company rules, even though the employees' actions may be considered appropriate and socially desirable.") (internal quotation marks omitted).

In any event, Scriven's common-law retaliation claim suffers from the same causation flaw as his statutory claim.  The record shows that Scriven raised the issue once with Olson in

January 2014, more than a year before he was fired.  There is no evidence of any pattern of antagonism or retaliatory treatment following his conversation with Olson.  (Scriven Aff. ¶ 17). Like his statutory claim, there simply is a lack of any evidence from which a reasonable jury could conclude that Reiser terminated Scriven in retaliation for his questions concerning the alleged over-invoicing.  Accordingly, Reiser is entitled summary judgment on Counterclaim Count Eight.

### 2.     Breach of Contract (Count Two)

Counterclaim Count Two alleges a claim for breach of contract based on Reiser's failure to provide Scriven with severance pay.  Scriven's employment offer entitled him to six months' severance pay if "the company were to recommend a separation without cause."  (Offer Letter at 4).  The sole disputed issue is whether Scriven was terminated with or without cause.

The offer letter itself does not define what constitutes cause.  When a terminated employee occupied a managerial position, Massachusetts courts have defined cause to mean:

> [T]here existed (1) a reasonable basis for employer dissatisfaction with a[n] . . . employee, entertained in good faith, for reasons such as lack of capacity or diligence, failure to conform to usual standards of conduct, or other culpable or inappropriate behavior, or (2) grounds for discharge reasonably related, in the employer's honest judgment, to the needs of his business.  Discharge for a 'just cause' is to be contrasted with discharge on unreasonable grounds or arbitrarily, capriciously, or in bad faith.

*Goldhor v. Hampshire Coll.*, 25 Mass. App. Ct. 716, 723 (1988) (quoting *G & M Emp't Serv., Inc. v. Commonwealth*, 358 Mass. 430, 435 (1970)); *Klein v. President & Fellows of Harvard Coll.*, 25 Mass. App. Ct. 204, 208 (1987).

In assessing whether cause exists for the termination of a high-level employee, Massachusetts law "leave[s] some scope for the exercise of subjective judgment on the part of the

employer." *Goldhor*, 25 Mass. App. Ct. at 722.  However, as noted, the law also requires that judgment to be entertained in good faith.

Reiser contends that Scriven's performance was unsatisfactory and that he was largely, if not completely, unsuccessful in performing the job for which he was hired.  Reiser has submitted evidence of a number of instances in which it alleges Scriven's performance fell short of expectations, including (it alleges) Scriven's record of failing to hire necessary subordinates and a poor understanding of the company's business and financial information.  It is undisputed that Derby, Olson, George Reiser, and Robert Reiser met with Scriven several times throughout 2014 to discuss areas that the company wanted Scriven to address.

Scriven, however, contends that the company had little-to-no plan for his position, that he did not receive any support or guidance from company leadership, and that, in substance, the company effectively set him up to fail.  As evidence of his ability and performance at Reiser, Scriven points to statements made by Derby for a job reference after he was terminated in February 2015.  According to Jeff Valentine, a recruiter working in the packaging industry, Derby described Scriven as an "incredible leader . . . great at marrying tactics and strategy," and a person who "fits well with everyone he comes in contact with."  (Def. Opp. Ex. 13).  And, especially relevant to Reiser's contention that Scriven failed in hiring necessary subordinates, Derby noted that Scriven "grew the sales team."  (*Id.*).  Finally, Scriven also points to the fact that in accordance with his offer letter, Reiser paid him a $100,000 bonus for 2014 for "achieving the agreed on, Board-approved Sales & Marketing Plan."  (Offer Letter at 3).

"As the existence of just cause is an affirmative defense, 'commonly a question of fact, it rarely can be ruled as matter of law that it has been sustained.'"  *Goldhor*, 25 Mass. App. Ct. at 722 (quoting *Chaplain v. Dugas*, 323 Mass. 91, 93 (1948)).  Taking the facts in the light most

favorable to Scriven, the record contains just enough evidence that a reasonable jury could conclude that Reiser's dissatisfaction with his employment was either unreasonable or entertained in bad faith.  Accordingly, Reiser's motion for summary judgment on Counterclaim Count Two will be denied.

### 3.      Breach of the Implied Covenant of Good Faith and Fair Dealing (Count Three)

Counterclaim Count Three alleges a claim for breach of the implied covenant of good faith and fair dealing.  As with the counterclaim for express breach of contract, Scriven's claim for breach of the implied covenant rests on Reiser's refusal to pay him severance, an issue specifically addressed by the express terms of the parties' agreement.  Even assuming Scriven is successful in establishing his right to severance at trial, however, there is no record evidence of any additional conduct by Reiser related to Scriven's right to receive severance.  *Cf. Bruno Int'l Ltd. v. Vicor Corp.*, 2015 WL 5447652, at *4, n.2 (D. Mass. Sept. 16, 2015) ("Where a party has breached an  express term of the contract, a claim for breach of the implied covenant of good faith and fair dealing 'require[s] additional factual allegations of unfairly leveraging the contract terms for undue economic advantage.'") (quoting *Christensen v. Kingston Sch. Comm.*, 360 F. Supp. 2d 212, 229 (D. Mass. 2005)).  If he is unsuccessful in proving a breach of the express terms, then, as a matter of law, he will have failed to show any reasonable expectation or understanding that he would have received severance pay in the first place.

In either event, Scriven's ability to recover severance pay will therefore rise or fall with his express breach of contract claim in Count Two, and his claim for breach of the implied covenant in Count Three is unnecessary and redundant.  *See USX Corp. v. Prime Leasing Inc.*, 988 F.2d 433, 438 (3d Cir. 1993) (Pennsylvania law) ("[O]ne can invoke 'implied' terms only when there are no express terms in the contract relating to the particular issue.").  Reiser either did

or did not rightfully terminate Scriven for cause, and he therefore was or was not entitled to severance.  Accordingly, Reiser's motion for summary judgment will be granted as to Counterclaim Count Three.

**IV.**     **Conclusion**

For the foregoing reasons, Reiser's motion to strike is GRANTED in part and DENIED in part.  Reiser's motion for summary judgment is GRANTED as to Counts One, Two, and Three of the complaint, GRANTED as to Counterclaim Counts Three and Eight, and DENIED as to Counterclaim Count Two.

**So Ordered.**

/s/ F. Dennis Saylor<br>F. Dennis Saylor IV

Dated: September 1, 2016                           United States District Judge